IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| KELLY STEVENS, | ) | Case No. 3:20-cv-1527 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Kelly Stevens, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. § 405(g), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 17.  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Stevens's application for DIB must be AFFIRMED.

I.    **Procedural History**

Stevens applied for DIB on June 1, 2015.  (Tr. 450).[1]  She said that she became disabled on November 18, 2014, due to: "1. Severe Vertigo; [and] 2. Nerve Damage in head."  (Tr. 535).  The Social Security Administration denied Stevens's application initially and upon reconsideration.  (Tr. 232-58).  Stevens requested an administrative hearing.  (Tr. 311-13).  ALJ

---

[1] The administrative transcript appears in ECF Doc. 14.

Patricia Carey heard Stevens's case on June 16, 2017 and denied the claim in a December 28, 2017 decision  (Tr. 190-231, 259-86).  On June 27, 2018, the Appeals Council vacated the ALJ's decision and remanded the case for further development of the record and consideration.  (Tr. 287-291).

ALJ Carey conducted a new hearing on January 24, 2019 and denied the claim in an April 26, 2019 decision.  (Tr. 12-38, 154-89).  In doing so, the ALJ determined that Stevens had the residual functional capacity ("RFC") to perform sedentary work, except that:

> she can occasionally climb ramps and stairs, never climb ladders ropes or scaffolds, and can occasionally balance, stoop, kneel, crouch, and crawl.  She can never work around hazards, such as unprotected heights or moving dangerous mechanical parts, she is to do no commercial driving, and can occasionally work in conditions of humidity and wetness, in conditions of extreme heat or cold, or in conditions where there are vibrations.  She is limited to no foot controls with the left foot.  She is limited to jobs that require no more than occasional reading.  She is limited to a sit/stand option at the workstation each hour to change position for two minutes while being on task 95% of the time.  She is to be able to use an ambulation device to ambulate to the workstation.  She is also limited to performing simple, routine and repetitive tasks, but not at a production rate pace, for example, no assembly line work.  She is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting.  Any necessary changes need to occur infrequently, and be adequately and easily explained.

(Tr. 20).  Based on vocational expert ("VE") testimony that an individual with Stevens's age, experience and RFC could work in such representative occupations as trim touch up inspector, final assembler, or touch up screener, the ALJ determined that Stevens wasn't disabled because she could perform a significant number of jobs in the national economy.  (Tr. 28-29).  On May 26, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  And, on July 19, 2020, Stevens filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Stevens was born on December 17, 1968; she was 45 years old on the alleged onset date;

and she was 50 years old on the date of the 2019 ALJ hearing.  (Tr. 28, 450).  She graduated

from high school and had "some college" education.  (Tr. 163).  She had past work experience as

a dump truck driver, semi-truck driver, machine feeder, mental health aide, corrections officer,

and administrative assistant.  (Tr. 27, 157).

### B.     Objective Medical Evidence

The ALJ decision exhaustively summarized the relevant objective medical evidence.  *See*

(Tr. 4216-27).  Stevens does not challenge the ALJ's summary of the objective medical evidence

or submit new evidence, but challenges only the ALJ's evaluation of the opinion evidence and of

Stevens's subjective complaints.  *See generally* ECF Doc. 15.  Independent review does not

reveal any material inconsistencies between the ALJ's summary of the facts and the record

before this court.  *Compare* (Tr. 21-25), *with* (Tr. 627 - 1910).  Thus, the court adopts the

following summary of objective medical evidence from the ALJ's decision:[2]

> The claimant has a history of treatment for lumbar spine degenerative disc disease
> with moderate canal stenosis, spondylosis, and radiculopathy; status post spinal
> fusion with laminectomy; peripheral vertigo involving the right ear; vestibular
> hypofunction right ear; mild osteoarthritis left foot; and depression.  She has been
> followed by Erik Neilsen, M.D., David Lali, M.D., Ohio Health Physical Rehab,
> Blanchard Valley Hospital, OSU Wexner Medical Center, Total Rehab,
> Dr. Edward Dodson, UT Health, Ohio State Ear, Nose, and Throat, The Ohio
> University Hearing Professionals, Mercy Tiffin Hospital, Gary Bellack, M.D.,
> Dr. Nye, Promedica Home Health PT, Dr. Jason Schroeder, Dr. Steiner,
> Dr. Rogers, Fostoria Community Hospital, Dr. Moghal, Firelands Counseling,
> Dr. Mark Weiner, the Herbert-Perna Center, Cigna Health, and the Toledo Pain

---

[2] *See Biestek v. Comm'r of Soc. Sec.*, No. 16-cv-10422, 2017 U.S. Dist. LEXIS 47762, at *2-3 (E.D. Mich. Feb. 24, 2017) (adopting an ALJ's summary of medical evidence and hearing testimony), *adopted by* 2017 U.S. Dist. LEXIS 47209 (E.D. Mich. Mar. 30, 2017), *aff'd by* 880 F.3d 7787 (6th Cir. 2017), *aff'd by* 139 S. Ct. 1148 (2019).  *See also Paulin v. SSA*, 657 F. Supp. 2d 939, 942 (M.D. Tenn. 2009); *Hase v. Colvin*, 207 F. Supp. 3d 1174, 1177 (D. Or. 2016).

Center (Exhibits 1F-5F, 7F-l1F, 13F-32F, and 34F-44F [Tr. 627-738, 749-987, 992-1478, 1497-1903]).

Treating sources have noted lumbar spine degenerative disc disease with moderate canal stenosis, spondylosis, and radiculopathy; status post spinal fusion with laminectomy; peripheral vertigo involving the right ear; vestibular hypofunction right ear; and mild osteoarthritis left foot (Exhibits 1F-5F, 7F-l1F, 13F-32F, and 35F-44F [Tr. 627-738, 749-987, 992-1478, 1509-1903]).  These sources have noted back pain, vertigo, dizziness, foot pain, and other symptoms/findings (Exhibits 1F-5F, 7F-F11F, 13F-32F, and 35F-44F [Tr. 627-738, 749-987, 992-1478, 1509-1903]).  This would affect the claimant's ability to lift, carry, stand, walk, as well as perform certain postural and environmental activities.  Records from the Ohio State University Eye and Ear Institute were reviewed (Exhibit 41F [Tr. 1821-26]).  These records noted vestibular hypofunction of the claimant's right ear. Vestibular testing by Dr. Dobson (videonystagmography "VNG" and video head impulse test "vHIT") noted the claimant to be status post right posterior semicircular canal occlusion and subsequent MCF vestibular nerve section and secondary CSF repair/lumbar drain (Exhibit 41F, page 3 [Tr. 1823]).  Based upon testing, the overall impression of the claimant was that conclusions regarding residual transmission through the inferior division of the right vestibular nerve are uncertain and that there was no evidence of peripheral vestibular involvement in the left ear on any of the tests (Exhibit 41F, page 4 [Tr. 1824]).  The claimant was noted to be indicated with vestibular hypofunction of the right ear and peripheral vertigo involving right ear (Exhibit 41F, page 5 [Tr. 1825]).

Records from Mark Weiner, D.O. were also reviewed (Exhibits 35F and 40F [Tr. 1509-15, 1802-20]).  These records noted treatment of the claimant for peripheral vertigo, headache disorder, chronic low back pain, insomnia, depression, etc.  The claimant was also noted with a past medical history of four back surgeries, two right knee arthroscopy, spinal cord stimulator placement, right ear surgeries, etc. (Exhibits 35F and 40F [Tr. 1509-15, 1802-20]).

Dr. Dodson . . . treated the claimant for peripheral vertigo (see, Exhibit 14F [Tr. 1010-12]). . . . [O]n November 21, 2016, Dr. Dodson noted how pleased he was with how the claimant was doing, noting the claimant with no evidence of CSF leak and her dizziness/imbalance issues improved and noted that her activities can be increased but that she should only continue to avoid heavy lifting or strenuous activity (Exhibit 13F, page 4 [Tr. 995]).  His records showed that on October 27, 2016, right middle cranial fossa approach to vestibular nerve section was performed (Exhibit 13F, page 11 [Tr. 1002]) and that on November 10, 2016, right middle cranial fossa approach to repair of cerebrospinal fluid leak was performed (Exhibit 13F, page 14 [Tr. 1005]).

* * *  On April 30, 2016, the claimant was noted to be able to ambulate without a cane/walker and only held on to a handrail (Exhibit 12F, page 3 [Tr. 990]).  At this same visit, she was noted to be able to sit for the duration of the interview

4

without obvious signs or discomfort or distress (Exhibit 12F, page 3 [Tr. 990]). Tellingly, the claimant was noted to have viewed herself as disabled/limited due to her dizziness (and conversely, not due to back pain, psychiatric issues, etc.) (Exhibit 12F, page 3 [Tr. 990]).  Physical examination of the claimant on February 8, 2017 by Dr. David Lali noted the claimant's neck, vision, chest, etc. to be normal (Exhibit 16F, pages 7-8 [Tr. 1046-47]).  Regarding the claimant's musculoskeletal system, examination of her lumbosacral spine revealed no tenderness to palpation, no pain, no swelling, edema or erythema of surrounding tissue and normal lumbosacral spine movements (Exhibit 16F, page 8 [Tr. 1047]). Similar findings were noted by Dr. Lali on May 9, 2015 (Exhibit 2F, pages 39-40 [Tr. 685-86]).  Review of systems on July 28, 2018 by Dr. Ward noted no problems with the claimant's neck, cardiovascular system, lungs, abdomen, extremities, etc. (Exhibit 33F, page 4 [Tr. 1482]).  In his examination of the claimant's musculoskeletal system, while some problems were noted, it was also noted that the claimant had no joint swelling, erythema, effusion, tenderness or deformity; noted that the claimant was able to lift, carry and handle light objects; and noted that the claimant was able to squat and rise with ease (Exhibit 33F, page 5 [Tr. 1483]).

In records from Cigna Health, physical examination of the claimant on November 25, 2014 noted, regarding the claimant's musculoskeletal system/lumbosacral spine, no tenderness to palpation, no pain, no swelling, edema or erythema of surrounding tissue and normal lumbosacral spine movements (Exhibit 38F, page 12 [Tr. 1542]).  Neurologically, 5/5 normal muscle strength was noted in all muscles (Exhibit 38F, page 12 [Tr. 1542]).

As noted earlier, regarding the claimant's left foot, records from Total Rehab were reviewed (Exhibit 42F [Tr. 1827-72]).  The claimant was noted with displaced fracture of fourth metatarsal, nondisplaced fracture of third metatarsal, and nondisplaced fracture of second metatarsal, left foot (Exhibit 42F, page 4 [Tr. 1830]).  X-ray results were noted to have showed minimally displaced left second, third, fourth metatarsal base fractures (Exhibit 42F, page 8 [Tr. 1834]). Likewise, CT-scan were noted to have showed minimal displacement of the metatarsal fractures and no significant widening of the Lisfranc complex (Exhibit 42F, page 8 [Tr. 1834]).  The claimant was noted to have elected for conservative management and to be doing okay overall (Exhibit 42F, page 8 [Tr. 1834]). Moreover, on March 5, 2018, the claimant was noted to be ambulating without any assistive device (Exhibit 42F, page 8 [Tr. 1834]).  On March 5, 2018 entries noted that the claimant was advised that her overall foot radiographs look good; her fractures were healed; that there were no signs of instability; and that she could return to all normal activities (Exhibit 42F, page 10 [Tr. 1836]).  X-ray results dated August 30, 2018 of the claimant's left foot were noted to show well-healed central metatarsal fractures; no evidence of any new fracture; anatomic alignment; no evidence of any tarsal metatarsal instability; and mild to moderate degenerative changes (Exhibit 42F, page 45 [Tr. 1871]).

Records from Jason Schroeder, M.D. were also reviewed (Exhibits 26F, 37F, and 43F [Tr. 1301-36, 1525-30, 1873-77]).  These records noted treatment rendered to the claimant due to complaints of low back pain, thigh pain, etc. along with the claimant's medical history of back surgeries etc. Surgery due to stenosis was noted in October 2009 and October 2016, and L3-Sl fusion surgery was noted in August 2017 (Exhibit 43F, page 2 [Tr. 1874]).  It was also noted that the claimant had a spinal cord stimulator ("SCS") implanted on February 15, 2018 by Dr. Moghal, as she continued to have back pain, bilateral anterior thigh pain and numbness/tingling in her bilateral toes, was using a walker to help with ambulation, continued to have intermittent falls, and used Percocet and Zanaflex to help with pain and spasms (Exhibit 43F, page 3 [Tr. 1875]).  In his assessment of the claimant on December 16, 2018, Dr. Schroeder noted the claimant with lumbar fusion as well as SCS, noted that the clamant [*sic*] should continue using her stimulator, noted that he did not think a CT scan at this time would be useful as the claimant may still be forming bone fusion as there is some mild lucency around the L3-Sl screws by the radiologist's interpretation, but that this is stable over time and has not clearly worsened (Exhibit 43F, page 3  [Tr. 1875]).  X-ray results dated December 3, 2018 of the claimant's lumbar spine showed L3-Sl posterior spinal fusion with laminectomy; no interval change in alignment; and with subtle lucency noted about the L3 and S1 transpedicular screws (Exhibit 43F, page 5 [Tr. 1877]).

Entries dated February 26, 2018 noted improved back/leg pain after placement of spinal cord stimulator (Exhibit 37F, page 2 [Tr. 1526]).  In addition, it was noted that the claimant recently had spinal cord simulator placed by Dr. Mogul and that while she has had some mild tingling in her arms, it was related to the way she has been laying down lately (Exhibit 37F, page 2 [Tr. 1526]).  X-ray results dated July 26, 2018 of the claimant's lumbar spine showed evidence of laminectomy at L3-5 with posterior spinal hardware fusion from L3-S1 level with no evidence of hardware complications or change in alignment (Exhibit 37F, pages 4-5 [Tr. 1528-29]).  Earlier February 26, 2018 lumbar spine x-ray results had noted no acute lumbar spine pathology; redemonstration of posterior fusion hardware at L3-S1; lucency developing along the transpedicular screws of S1 suggestive of hardware loosening; and mild degenerative changes (Exhibit 37F, page 6 [Tr. 1530]).

At a visit on February 16, 2017, after the claimant's December 2016 back surgery, the claimant was noted to report that she was doing very well, had no complaints, reported that she was not having any of the symptoms she was having prior to the surgery, and was able doing everything she wants to do (Exhibit 26F, page 18 [Tr. 1318]).  Moreover, the claimant was noted to have denied having any other complaints, reported having no back pain, and reported having no weakness or numbness (Exhibit 26F, page 18 [Tr. 1318]).

Records from Toledo Pain Services, PLL/Dr. Moghal were reviewed (Exhibit 44F [Tr. 1878-1903]).  These records noted the claimant's complaints of back pain with radiation down left leg along with left foot pain.  On April 18, 2018, while

complaints of low back pain were still noted, the claimant was also noted to have reported that she felt she was improving with her spinal cord stimulator and reported that she was able to work in her flower bed recently (Exhibit 44F, page 7 [Tr. 1884]).  With a theme of the claimant's continued improving condition, entries dated July 16, 2018 noted continued improvement of pain in the claimant's lower back/legs, with the claimant reporting that she no longer getting as many shocks in legs or feet after SCS placement (Exhibit 44F, page 10 [Tr. 1887]).  On July 16, 2018 also noted that the claimant had surgery scheduled for May 23, 2018 with Dr. Dodson at Ohio State on left vestibule system for tumor removal (Exhibit 44F, page 10 [Tr. 1887]).  This was noted to be an inpatient procedure and that the claimant would be in the hospital for only two to three days (Exhibit 44F, page 10 [Tr. 1887]).

Regarding the claimant's psychiatric allegations, treating sources have note [sic] depression (see, e.g., Exhibits 2F, 28F, 34F, and 38F [Tr. 647-87, 1394-96, 1497-1508, 1531-1682]).  These sources have noted the claimant with depressed mood, diminished interest/pleasure in most things, insomnia, fatigue, low energy, feelings of helplessness or worthlessness, and other symptoms/findings (see, e.g., Exhibits 2F, 28F, 34F, and 38F [Tr. 647-87, 1394-96, 1497-1508, 1531-1682]). . . . Records from Firelands Counseling were reviewed (Exhibit 34F [Tr. 1497-1508]).  These records show treatment rendered to the claimant in February 2018 for major depressive disorder. The claimant was noted with  symptoms such as depressed mood, diminished interest/pleasure in most things, insomnia, fatigue, low energy, feelings of helplessness or worthlessness (Exhibit 34F, page 8 [Tr. 1504]).  However, aside from the initial visit, it appears that the claimant was not compliant with her treatment/visits.  On February 21 , 2018, she was noted to be a "no show" (Exhibit 34F, page 9 [Tr. 1505]).  On March 6, 2018, she was noted to have cancelled her appointment (Exhibit 34F, page 10 [Tr. 1506]).  On March 19, 2018, she was noted to be a "no show" (Exhibit 34F, page 11 [Tr. 1507]).  On March 21, 2018, she was noted to be absent from her assigned group (Exhibit 34F, page 12 [Tr. 1508]).

Mental status examination of the claimant on November 25, 2014 noted the claimant with appropriate affect, normal speech, noted her to be alert, cooperative, well groomed, in no acute distress, and oriented on all spheres (Exhibit 38F, pages 11-12 [Tr. 1541-42]).

On April 30, 2016, while the claimant was noted with depressed mood etc., Wanda McIntyre, Ph.D. also noted the claimant to be alert, attentive, fully oriented, able to maintain appropriate eye contact, was appropriately groomed, with logical, coherent and goal directed thought processes, clear, effective, and fluent speech, and no signs of delusional ideation or perceptual disturbances (Exhibit 12F, pages 3-4 [Tr. 990-91]).

On December 7, 2017, Dr. Rogers noted the claimant had no significant mental health symptoms or cognitive deficits that would prevent her from having a spinal cord stimulator (Exhibit 28F, page 3 [Tr. 1396]).  In addition, he noted that no

further psychological services were recommended for the claimant at that time (Exhibit 28F, page 3 [Tr. 1396]).

Mental status examination of the claimant on February 8, 2017 noted the claimant to be alert, cooperative, well groomed, not in acute distress, and oriented on all spheres (Exhibit 16F, page 7 [Tr. 1046]).  Neurologically, she was noted with appropriate affect, normal speech, normal 5/5 muscle strength, normal cranial nerves/sensory, and normal coordination (Exhibit 16F, page 8 [Tr. 1047]).  Similar mental status/neurologic findings were noted on May 9, 2015 (Exhibit 2F, pages 39-40 [Tr. 685-86]).

*See* (Tr. 21-25).

### C.      Relevant Opinion Evidence

### 1.      Treating Physician Opinion – Edward Dodson, M.D.

On July 6, 2015, Dr. Dodson completed a "physical ability assessment."  (Tr. 1576-77).  Dr. Dodson noted that Stevens's diagnoses included ICD Codes 386.11 (benign paroxysmal positional vertigo), 386.35 (viral labyrinthitis), and 388.30 (tinnitus).  (Tr. 1576); *see also* ICD-10 CODE LOOKUP, https://icdcodelookup.com (last visited July 23, 2021).  Dr. Dodson indicated that Stevens could occasionally sit, stand, walk, reach, lift up to 100 pounds, carry up to 100 pounds, push and pull an unspecified weight, climb stairs and ladders, balance, stoop, kneel, crouch, and crawl.  (Tr. 1576-77).  She could constantly see and hear.  (Tr. 1577).  Dr. Dodson also explained that Stevens's condition was episodic, and that his assessment was based on her capacity during episodes.  (Tr. 1577).

On October 4, 2016, Dr. Dodson completed another "physical ability assessment."  (Tr. 1703-04).  Dr. Dodson noted that Stevens's diagnoses included ICD Codes H81.391 (peripheral vertigo), R26.89 (gait/mobility abnormalities), and H90.5 (hearing loss).  (Tr. 1703); *see also* ICD-10 CODE LOOKUP, https://icdcodelookup.com (last visited July 23, 2021).  Dr. Dodson indicated that Stevens could constantly engage in fine manipulation, simple grasping, firm grasping, seeing, hearing, and using lower extremities for foot controls.  (Tr. 1703-04).  She

could frequently sit and reach.  (Tr. 1703).  And she could occasionally stand, walk, lift over 100 pounds, carry over 100 pounds, push, pull, climb stairs and ladders, balance, stoop, kneel, crouch, and crawl.[3]  (Tr. 1704).

On January 30, 2017, Dr. Dodson completed a "medical source statement of ability to do work-related activities (physical)."  (Tr. 1011-12).  Dr. Dodson indicated that Stevens's diagnosis was peripheral vertigo, including symptoms of "dizziness/imbalance."  (Tr. 1011).  Dr. Dodson indicated that Stevens could never sit, stand, walk, lift or carry any amount, bend, squat, crawl, climb stairs or ramps, climb ladders or scaffolds, or reach.  (Tr. 1011-12).  Dr. Dodson said that Stevens would have unpredictable good and bad days, her symptoms would affect her ability to concentrate or focus for more than 50% of the day, and she would miss work more than four days per month.  (Tr. 1012).

On February 11, 2018, Dr. Dodson wrote a letter, indicating that he had treated Stevens for intractable benign paroxysmal positional vertigo, and that her treatment history and his own consultation with other providers suggested that she had Meniere's disease or vestibular migraine.  (Tr. 1483-84).  Dr. Dodson anticipated that a posterior canal occlusion procedure followed by vestibular rehab would relieve Stevens's symptoms and preserve her hearing.  (Tr. 1476).  He also indicated that he'd ordered a functional capacity evaluation, which showed that she "would have difficulty with any job functioning due to deficits [in] balance, decreased vision, and increased pain.  She required frequent position changes in sitting and standing."  (Tr. 1477-78).

---

[3] The form stated that "occasionally" meant "0-2.5 Hrs/Day," and "0" is circled on the form.  (Tr. 1704).

### 2.     Examining Orthopedist Opinion – Najin Ward, M.D.

On July 28, 2018, Najin Ward, MD, completed a functional examination to assess Stevens's physical capacity.  (Tr. 1480-86).  Examination showed that Stevens had normal strength, range of motion, fine motor coordination, and handling.  (Tr. 1485).  She was able to sit, stand, and walk with a walker.  (Tr. 1485).  She could rise from the exam table without problems or assistance.  (Tr. 1485).  Based on her examination, Dr. Ward determined that Stevens could sit for up to 15 minutes, stand for up to 10 minutes, walk for up to 2 minutes, and lift 0 pounds.  (Tr. 1485).

On the same day, Dr. Ward completed a "medical source statement of ability to do work related activities."  (Tr. 1491-96).  Dr. Ward determined that Stevens could never lift up to 10 pounds.  (Tr. 1491).  She could sit for up to 10 minutes at a time and 2 hours in a day, stand for up to 10 minutes at a time and 1 hour in a day, and walk for up to 5 minutes at a time and 1 hour in a day.  (Tr. 1492).  Stevens could occasionally reach in all directions, finger, push, pull, and crawl.  (Tr. 1493-94).  She could frequently handle and continuously feel.  (Tr. 1493).  She could never operate foot controls, climb stairs and ramps, climb ladders or scaffolds, balance, stoop, kneel, or crouch.  (Tr. 1494).  She could climb a few steps at a reasonable pace with a handrail.  (Tr. 1496).  Although she had difficulty hearing, she retained the ability to understand simple instructions and communicate simple information.  (Tr. 1494).  She could avoid ordinary hazards, but she could never be exposed to: unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme heat, or vibrations.  (Tr. 1494-95).  She could tolerate moderate noise and occasionally tolerate extreme cold.  (Tr. 1495).  She couldn't read very small print, ordinary newspaper print, or a computer screen.  (Tr. 1494).

### 3.     Physical Therapist Examinations

#### a.     Helen Sprague, PT

On July 15, 2015, Hellen Sprague, PT, examined Stevens and completed a "physical ability assessment." (Tr. 1591-92). Sprague determined that Stevens could constantly sit, engage in fine manipulation, grasp simply or firmly, and see. (Tr. 1591-92). She could frequently stand, frequently reach at desk level, and occasionally walk. (Tr. 1591). She could never reach overhead, reach below waist, lift or carry any amount, push, pull, climb stairs or ladders, balance, stoop, kneel, crouch, or crawl. (Tr. 1591-92).

#### b.     Jeremy Smith, PT

On February 1, 2018, Jeremy Smith, PT, conducted a functional capacity examination. (Tr. 1748-56). Stevens told Smith that she: (1) was unable to read small print, drive for an hour, stand for 30 minutes or more, walk for 2 blocks or more, climb a flight of stairs, climb an 8-foot ladder, kneel for 5 minutes, lift 20 pounds, or carry 20 pounds or more; (2) had severe difficulty preparing meals, bathing, using a telephone, hearing sounds, operating a computer, sitting for 2 hours, shopping for essentials, and housekeeping; and (3) had moderate difficulty using the toilet and sitting for 30 minutes. (Tr. 1749). After examination, Smith opined that Stevens could lift or carry up to 5 pounds. (Tr. 1756). She could never bend, stoop, climb ladders, crawl, operate foot controls, kneel, or squat. (Tr. 1756). She could seldomly climb steps, finger, handle, reach high, stand, and walk. (Tr. 1756). And she could occasionally sit. (Tr. 1756). Smith explained that Stevens "required upper extremity support frequently to prevent falling [and] would have difficulty with any job functioning due to . . . poor balance, decreased vision, and increased pain. She required frequent position changes in sitting and standing." (Tr. 1756).

On August 7, 2018, Smith completed another functional capacity examination. (Tr. 1516-24). He determined that Stevens could lift up to 5 pounds. (Tr. 1524). She could never

bend, stoop, climb ladders, climb steps, crawl, handle, or reach high.  (Tr. 1524).  She could seldomly finger and operate foot controls.  (Tr. 1524).  Smith explained that Stevens "had decreased gait and . . . would have difficulty keeping any job due to increased pain and difficulty with concentration and balance."  (Tr. 1524).

### 4.    State Agency Consultant Opinions

On July 31, 2015, state agency medical consultant Linda Hall, MD, evaluated Stevens's physical capacity based on a review of her medical records.  (Tr. 236-39).  Dr. Hall determined that Stevens could lift up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for up to 6 hours in an 8-hour workday; sit for up to 6 hours in an 8-hour workday; and push and/or pull without limitation.  (Tr. 236).  She could frequently climb ramps/stairs and balance.  (Tr. 237).  She could never climb ladders, ropes, or scaffolds.  (Tr. 236).  And she could stoop, kneel, crouch, and crawl without limitation.  (Tr. 237).  She needed to avoid concentrated exposure to vibration and hazards but had no other environmental limitations.  (Tr. 237-38).  And she did not have any manipulative, visual, or communicative limitations.  (Tr. 237).  Based on her assessment, Dr. Hall determined that Stevens was able to perform light work.  (Tr. 239).  On November 16, 2015, James Cacchillo, DO, concurred with Dr. Hall's opinion.  (Tr. 250-52).

On November 18, 2015, state agency psychologist Audrey Todd, Ph.D., evaluated Stevens's mental capacity based on a review of her medical records.  (Tr. 253-54).  Dr. Todd determined that Stevens did not have any understanding or memory limitations.  (Tr. 253).  She had moderate limitations in carrying out detailed instructions, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, making simple work-related decisions, completing a normal workday without interruptions from psychological symptoms, performing at a consistent pace without unreasonable rest periods, interacting appropriately with the general public, accepting instructions, responding

appropriately to supervisor criticism, getting along with coworkers without distracting them, responding appropriately to workplace changes, traveling in unfamiliar places, setting realistic goals, and making independent plans. (Tr. 253-54). She was not significantly limited in carrying out short and simple instructions, maintaining attention and concentration, sustaining an ordinary routine without supervision, working in coordination or proximity to others, asking simple questions, requesting assistance, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, being aware of hazards, and taking appropriate precautions. (Tr. 253-54).

### D.  Relevant Testimony

At the ALJ hearing, Stevens testified that she had difficulty climbing stairs and walking due to her imbalance, and she needed help whenever she climbed the four stairs into her house or walked. (Tr. 162-63, 176-77). She only left her home to go to doctors' appointments. (Tr. 179). With assistance she could walk for up to 10 minutes, but she couldn't lift any amount. (Tr 170-71). Stevens said that reading was difficult due to vision problems, but she could write her name. (Tr. 163-64). She had a valid driver's license, but she didn't drive because she couldn't judge distance and had blurry vision. (Tr. 165). She needed help showering due to her imbalance. (Tr. 166). She didn't do any household chores or cooking, and she no longer had any hobbies (including reading or watching television). (Tr. 172-73). Stevens said that she didn't think she could perform a job that required sitting because sitting was painful, and she couldn't concentrate. (Tr. 174).

Stevens said that she was always dizzy, constantly nauseous, and had pain in her back, legs, and feet. (Tr. 168). She said that she couldn't be in one position for long (up to 15 minutes), and she spent her day alternating between her bed, recliner, couch, and walks around the house with her walker. (Tr. 168, 171, 181). Some days she didn't get out of bed. (Tr. 168).

She had headaches, blurred vision, and depression.  (Tr. 168-69).  She tried multiple different therapies (including activities to help her brain learn to compensate for her imbalance), but they didn't work.  (Tr. 177).  Her nausea medicine helped, but it made her tired and some days her nausea overpowered it.  (Tr. 178).  Stevens said that her doctors told her there was nothing else they could do to treat her vestibular condition.  (Tr. 179-80).

VE Kimberly Eisenhuth testified that, if a hypothetical individual needed an ambulation and balance aide like a walker or cane to be able to move, all work would be precluded.  (Tr. 187).  And if an individual were off task 25% or more in a workday, missed eight to 9 days of work per year, or needed to lie down outside of normal breaks, she could not perform any work. (Tr. 187).

III.    **Law & Analysis**

A.    **Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal

standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)).

### B.      Evaluation of Dr. Dodson's Opinions

Stevens argues that the ALJ failed to apply proper legal standards in evaluating Dr. Dodson's opinions when she: (1) improperly gave equal weight to state agency consultants' opinions, which did not include review of all the evidence in the record; (2) failed to acknowledge that Dr. Ward's, Sprague's, and Smith's opinions were consistent with Dr. Dodson's opinions; and (3) overall failed to provide "good reasons" or a "legitimate medical basis" for discounting Dr. Dodson's opinions.  ECF Doc. 15 at 19-22.  Instead, Stevens asserts that the ALJ improperly relied on her own medical judgment and lay analysis of "raw medical data" by comparing Dr. Dodson's opinions to the objective medical evidence.  ECF Doc. 15 at 21, 23.  Steven also contends that substantial evidence didn't support the ALJ's evaluation of Dr. Dodson's opinion because: (1) Dr. Dodson's description of how she responded to treatment in 2016 had limited relevance; (2) the ALJ's discussion of orthopedic and heart systems findings wasn't relevant to her primary alleged disability; and (3) a note reflecting that she "only" used a wall to balance in 2016 was a non sequitur.  ECF Doc. 15 at 20-21.  Stevens argues that the ALJ's error in the evaluation of Dr. Dodson's opinions isn't harmless because VE testimony would have shown that she was disabled of the limitations from Dr. Dodson's opinion were adopted.  ECF Doc. 15 at 17-18.  The Commissioner disagrees.  ECF Doc. 19 at 16-23.

The regulations[4] in place at the time Stevens filed her application required the ALJ to give controlling weight to a treating physician's opinion unless she can articulate "good reasons" for discounting it. 20 C.F.R. § 404.1527(c); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Generally, "good reasons" include that the opinion: (1) wasn't "supported by medically acceptable clinical and laboratory diagnostic techniques"; or (2) was inconsistent with other medical evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017).

If the ALJ decides to discount a treating physician's opinion, she must then proceed to articulate what ultimate weight that opinion received based on several regulatory factors. *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)-(6). Those factors include: (1) the length and frequency of treatment; (2) the supportability of the opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the treating physician is a specialist; (5) the physician's understanding of the disability program and its evidentiary requirements; (6) the physician's familiarity with other information in the record; and (7) any other factor the ALJ might find relevant. *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)-(6). The regulations don't require the ALJ to specifically discuss any particular factor. 20 C.F.R. § 404.1527(c); *Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor."). But if the ALJ's explanation isn't sufficient to explain the ultimate weight given to the opinion or otherwise fails to give "good reasons" for discounting the opinion, remand is appropriate. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an opinion "'denotes a lack of

---

[4] On January 18, 2017, the Social Security Administration amended the regulations for evaluating opinion evidence for claims filed after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). Because Stevens filed her claims in 2015, the previous regulatory framework applies to this case.

substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record.'"  (citing *Rogers*, 486 F.3d at 243)).

Generally, a treating or examining physician's opinion is due more weight than a nonexamining physician's opinion.  20 C.F.R. § 404.1527(c)(2); *Gayheart*, 710 F.3d at 375. Nevertheless, an ALJ may rely on a state agency consultant's opinion or even give it greater weight than other sources' opinions if it is supported by the evidence (and other opinions aren't). *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015).  Further, an ALJ may rely on a state agency consultant's opinion that predates other medical evidence in the record, if the ALJ considers any evidence that the consultant did not consider.  *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009).

The ALJ applied proper legal standards in evaluating Dr. Dodson's treating physician opinion.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ didn't rely on his own medical judgment or analyze "raw medical data"[5] in evaluating Dr. Dodson's opinion, but instead appropriately evaluated Dr. Dodson's opinion based on evidence existing in the record.  (Tr. 27); *but see Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record.").  Instead, the ALJ complied with the "good reasons" requirement by stating that Dr. Dodson's opinion was given discounted weight because it wasn't supported by his own treatment notes and was inconsistent with other objective medical evidence in the record.  (Tr.

---

[5] Here, Stevens appears to confuse "objective medical evidence" (which the regulations direct the ALJ to consider) with "raw medical data" (which involves such evidence as uninterpreted x-rays and laboratory results).  *Compare Harris v. Comm'r of Soc. Sec.*, No. 1:14-cv-1212, 2015 U.S. Dist. LEXIS 215464, at *50-53 (N.D. Ohio, Feb. 23, 2015) (collecting cases indicating that an ALJ needs a medical opinion to interpret "raw medical data"); *with Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) (rejecting the argument that an ALJ is required to rely on a physician opinion when the ALJ could rely on her administrative assessment of objective medical evidence in the record).  But nothing in the record indicates that the ALJ relied upon uninterpreted diagnostic imaging or laboratory results.  *See generally* (Tr. 20-28).

27); 20 C.F.R. § 404.1527(c)(2); *Biestek*, 880 F.3d at 786; *Gayheart*, 710 F.3d at 376.  The ALJ

also acknowledged the requirements of 20 C.F.R. § 404.1527 and adequately articulated that

Dr. Dodson's opinion was still entitled to "some weight" because he was a treating source and

had significant history with Stevens.  (Tr. 20, 27); *Gayheart*, 710 F.3d at 376; 20 C.F.R.

§ 404.1527(c)(2)-(6).  Further, the regulations didn't preclude the ALJ from giving equal weight

(or even greater weight) to the state agency consultant's opinions, when the ALJ had found that

those opinions were generally consistent with the record as a whole (including evidence they

didn't have the opportunity to consider).  *Reeves*, 618 F. App'x at 274; *McGrew*, 343 F. App'x at

32.  And the ALJ wasn't required to exhaustively summarize how other sources' opinions were

*consistent* with Dr. Dodson's opinion, but was only required to explain her reasons for

*discounting* (i.e., inconsistency) his opinion.  *Cf.* 20 C.F.R. § 404.1527(c)(2); *Biestek*, 880 F.3d

at 786; *Gayheart*, 710 F.3d at 376.

Substantial evidence also supported the ALJ's finding that Dr. Dodson's opinion was

inconsistent with other evidence in the record.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.

Such evidence includes: (1) Dr. Dodson's November 2016 notes that he was pleased with

Stevens's progress, that her pain was well controlled, and that her dizziness/imbalance issued

had improved, (Tr. 995); (2) Dr. Dodson's letter anticipating that a posterior canal occlusion

procedure and vestibular rehabilitation would relieve Stevens's symptoms, (Tr. 1476); (3) notes

from April 2016 and March 2018 indicating that Stevens was able to ambulate *without*

assistance, could sit without discomfort, and had no signs of instability, (Tr. 990, 1834); (4) notes

that Stevens could lift, carry, and handle light objects and squat and rise with ease in July 2018,

(Tr. 1483); and (5) self-reports to treatment providers in February 2017, April 2018, and July

2018, indicating that she had improved after back surgery, was doing very well, had no

complaints about her condition, and was able to do everything she wanted to do (including

working on her flower bed), (Tr. 1318, 1884, 1887).  *Biestek*, 139 S. Ct. at 1154.  And, even though Stevens can point to other evidence in the record (or even a preponderance of the evidence) that might have supported a different finding, this court isn't allowed to second-guess the way the ALJ weighed the evidence.  *Jones*, 336 F.3d at 476-77; *O'Brien*, 819 F. App'x at 416.

Stevens's challenges to some of the evidence that the ALJ considered are also unavailing. Dr. Dodson's November 2016 notes weren't irrelevant to his opinions but were instead very relevant because they reflected his objective impressions *one month after* he issued his October 2016 opinion and *two months before* he issued his January 2017 opinion.  *Compare* (Tr. 995), *with* (Tr. 1011-12, 1703-04).  Also, the ALJ didn't misstate the record in indicating that Dr. Dodson treated Stevens only for vertigo, but instead merely summarized Dr. Dodson's own representations regarding his treatment.  *Compare* (Tr. 22), *with* (Tr. 11011, 1483-84, 1576, 1703).[6]  Further, the ALJ didn't recite orthopedic and heart systems findings in explaining why she discounted Dr. Dodson's opinion as Stevens appears to argue.  *Compare* (Tr. 27), *with* ECF Doc. 15 at 20.  Nevertheless, her discussion of any such records (even if not related to her primarily alleged disability) in the general evaluation of Stevens's RFC was arguably *required*

---

[6] To clarify, Dr. Dodson's notes reflected that the primary complaint that Stevens sought treatment from Dr. Dodson for was dizziness/imbalance; and his opinions stated that Stevens's symptoms and diagnoses included peripheral vertigo, benign paroxysmal positional vertigo, viral labyrinthitis, tinnitus, gait/mobility issues, hearing loss, and possible Meniere disease.  (Tr. 995, 1011, 1483-84, 1576, 1703). These are all vertigo-associated disorders and symptoms.  *See Vertigo-Associated Disorders*, A.D.A.M. Medical Encyclopedia (2021), *available at* Nat'l Inst. of Health, Medline Plus, https://medlineplus.gov/ency /article/001432.htm (last visited July 27, 2021) ("Peripheral vertigo may be caused by: benign position vertigo, . . . inflammation of the vestibular nerve (neuronitis), irritation and swelling of the inner ear (labyrinthitis), Meniere disease, [and] pressure on the vestibular nerve."); *Meniere's Disease*, A.D.A.M. Medical Encyclopedia (2021), *available at* Nat'l Inst. of Health, Medline Plus, https://medlineplus.gov/ menieresdisease.html (last visited July 27, 2021) (noting that dizziness, tinnitus, and hearing loss are common symptoms).

under the regulations.  *See* 20 C.F.R. § 404.1520(e) (requiring an ALJ to evaluate *all* the evidence in the longitudinal record in determining a claimant's RFC).

Because the ALJ's reasons for discounting Dr. Dodson's opinion were reasonably drawn from evidence in the record and the ALJ complied with the regulations, the ALJ's decision to discount Dr. Dodson's opinion fell within the Commissioner's "zone of choice."  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).  Accordingly, the ALJ's decision to discount Dr. Dodson's opinion must be AFFIRMED.

## C.    Evaluation of Subjective Symptom Complaints

Stevens next argues that the ALJ improperly failed to consider her employment history in evaluating her subjective symptom complaints.  (Tr. 23-24).  Stevens asserts that, because a claimant's demonstrated willingness to work is a factor under SSR 16-3p, the ALJ was required to consider that her work history supported a finding that her subjective complaints were credible.  (Tr. 23-24).  The Commissioner disagrees.  ECF Doc. 19 at 23-25.

The regulations direct ALJs to evaluate claimants' subjective symptom complaints based on the evidence in the longitudinal record and several regulatory factors.  *See* SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017); 20 C.F.R. § 404.1520(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability.").  The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  A claimant's

"prior work record" and "efforts to work" are among the many factors that an ALJ might consider in evaluating the claimant's complaints.  SSR 16-3p, 2016 SSR LEXIS at *16; 20 C.F.R. § 404.1529(c)(3).  And the focus of the ALJ's inquiry is not whether the claimant's statements are *credible*, but whether the representations the claimant makes concerning her ability to perform work activities are consistent with other evidence in the record reflecting her physical and mental abilities.  *See generally* SSR 16-3p, 2016 SSR LEXIS 4 (clarifying that the *credibility*-focused framework stemming from inartful language in SSR 96-7p had derailed the agency's sub-regulatory policy, which should have instead focused on consistency and supportability as the regulations directed).[7]

The ALJ applied proper legal standards in evaluating Stevens's subjective complaints.  Here, the ALJ's properly focused her evaluation on whether evidence in the record was consistent with what Stevens said about her ability to perform work related activities, rather than assessing whether her testimony was *credible*.  (Tr. 25) ("[T]he claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record."); SSR 16-3p, 2016 SSR LEXIS 4.  The ALJ also specifically acknowledged the analytical framework under 20 C.F.R. § 404.1529 and SSR 16-3p and discussed the evidence that she found *supported* her decision.  (Tr. 20); *Renstrom*, 680 F.3d at 1067.  Further, the record reflects that the ALJ considered her work history in evaluating her claims because: (1) she specifically discussed her work history at both the 2017 and 2019 hearings, (Tr. 157-58, 199-203); and (2) she included Stevens's work background report among the list of exhibits that she considered in issuing her written decision,

---

[7] Stevens describes the language error in SSR 96-7p and the agency's efforts to correct it in Footnote 12 of her merits brief.  *See* ECF Doc. 15 at 24 n.12 (explaining that "credibility" never appeared in the regulations, and that it was an inartful placeholder for the "actual required analysis of consistency and supportability").

(Tr. 34). And while greater discussion might have made the ALJ's decision more perfect, she wasn't required to provide any greater discussion of the evidence or factors. *Renstrom*, 680 F.3d at 1067; *Simons v*, 114 F. App'x at 733; *Craig*, 212 F.3d at 436. Additionally, the same evidence that supported the ALJ's evaluation of Dr. Dodson's opinion also supported the ALJ's conclusion that Stevens's subjective complaints were inconsistent with other evidence in the record. *Biestek*, 139 S. Ct. at 1154. Simply put, the ALJ's analysis followed the framework set out in the regulations, was supported by substantial evidence, and was sufficient to draw an accurate and logical bridge between the evidence and the result. *Fleischer*, 774 F. Supp. at 877; *Rogers*, 486 F.3d at 241; SSR 16-3p, 2016 SSR LEXIS 4; 20 C.F.R. § 404.1520(e).

Accordingly, the ALJ's decision must be AFFIRMED.

## IV. Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Stevens's application for DIB must be, and hereby is, AFFIRMED.

**IT IS SO ORDERED.**

Dated: September 2, 2021

Thomas M. Parker
United States Magistrate Judge